1

2

3

4

5

6

7

8

9          **IN THE UNITED STATES DISTRICT COURT**

10        **FOR THE EASTERN DISTRICT OF CALIFORNIA**

11

12   LILIANA MAGDALENO,                    CASE NO. CV-F-04-5632 LJO

13                    Plaintiff,            **DECISION ON SOCIAL SECURITY**
                                           **COMPLAINT**
14        vs.                              (Docs. 11-13.)

15   JO ANNE B. BARNHART,
     Commissioner of Social
16   Security,

17                    Defendant.
                                        /
18

19                          **INTRODUCTION**

20          Plaintiff Liliana Magdaleno ("plaintiff") seeks this Court's review of an administrative law

21   judge's ("ALJ's") decision finding that plaintiff is not disabled and is ineligible for Supplemental

22   Security Income ("SSI") under Title XVI of the Social Security Act ("Act"), 42 U.S.C. §§ 1381-1381d.

23   Pursuant to 28 U.S.C. § 636(c) and F.R.Civ.P. 73, the parties agreed to proceed before a United States

24   Magistrate Judge, and by an August 26, 2004 order, this action was assigned to United States Magistrate

25   Judge Lawrence J. O'Neill for all proceedings.  Based on review of the Administrative Record ("AR")

26   and the papers of plaintiff and defendant Jo Anne B. Barnhart, Commissioner of Social Security

27   ("Commissioner"), this Court DENIES plaintiff's request to reverse the Commissioner's decision to

28   deny plaintiff SSI or to remand for further proceedings.

                                        1

# BACKGROUND

## Plaintiff's Personal Background

Plaintiff is age 46, has a partial Mexican elementary school education, is unable to communicate in English, and has no past relevant work.  (AR 20, 85, 115, 142, 514, 515, 564.)

## Administrative Proceedings

On July 18, 2000, plaintiff protectively filed her SSI application at issue here with the Social Security Administration to claim disability since January 1, 1987 based primarily on fibromyalgia and body pains.  (AR 19, 84, 85.)[1]  With its March 21, 2001 Notice of Disapproved Claims, SSA denied plaintiff's claim and determined plaintiff's condition is not severe enough to keep her to work.  (AR 70.)

On May 10, 2001, plaintiff filed her Request for Reconsideration to claim: "My degree of pain is unbearable.  I cannot function in the real world because my pain and severe depression and anxiety disable me."  (AR 74.)  With its June 11, 2001 Notice of Reconsideration, SSA denied plaintiff's claim and again determined that her condition is not severe enough to prevent her to work.  (AR 75.)

On August 10, 2001, plaintiff filed her Request for Hearing by Administrative Law Judge to claim: "My disease has no cure.  I will never get better.  I have deteriorated to the point where I can no longer work, and I'm in constant pain."  (AR 79.)  On October 8, 2001, counsel was appointed for plaintiff.  (AR 39.)  After a July 11, 2002 hearing, the ALJ issued his October 9, 2002 decision to conclude that plaintiff's ability to perform work at all exertional levels is not significantly compromised by her non-exertional limitations and that plaintiff is not disabled.  (AR 456.)

Plaintiff submitted to SSA's Appeals Council a December 6, 2002 Request for Review of Hearing Decision/Order to claim she cannot perform substantial gainful work.  (AR 461.)  On February 21, 2003, the Appeals Council vacated the ALJ's October 9, 2002 decision and remanded the case to the ALJ to further consider treating source and reviewing opinions on plaintiff's residual functional capacity,

---

[1]     Plaintiff had filed protectively a March 26, 1999 SSI application to claim the same impairments and onset date, and with its September 2, 1999 Notice of Disapproved Claims, SSA denied plaintiff's claim and determined her condition did not prevent her to work.  (AR 66, 81, 82.)  An April 7, 1999 Disability Report of an SSA interviewer noted an absence of observable physical problems and that plaintiff was distraught because her husband had left her.  (AR 91.)  In his decision at issue here, the ALJ concluded "that there is not good cause in the form of new and material evidence, or error on the face of the evidence, to reopen the prior unfavorable initial determination."  (AR 20.)  Thus, the original determination based on plaintiff's March 26, 1999 SSI application is not the subject of this action.

1   to assess the credibility of all witnesses, and to obtain vocational expert testimony.  (AR 19, 459-460.)

2         On remand and after an August 6, 2003 hearing, the ALJ issued his December 9, 2003 decision

3   to conclude that plaintiff is able to perform the full range of unskilled at all exertional levels and is not

4   disabled. (AR 26.) Plaintiff submitted to the Appeals Council her January 27, 2004 Request for Review

5   of Hearing Decision/Order to claim she cannot perform substantial employment.  (AR 15.)  On March

6   12, 2004, the Appeals Council denied plaintiff's request for review to render the ALJ's decision as the

7   Commissioner's final determination subject to this Court's review.  (AR 9.)

8                              **Medical History And Records Review**[2]

9                        ***Daniel Watrous, M.D., Treating Rheumatologist***

10        Plaintiff treated with Daniel Watrous, M.D. ("Dr. Watrous"), a rheumatologist.  On March 18,

11  1997, plaintiff noted that Elavil helped her significantly and that she experienced aching and swelling

12  in her distal arms and legs. (AR 184, 204.) Dr. Watrous noted mildly tender fibromyalgia tender points,

13  assessed fibromyalgia, and noted an absence of evidence for an inflammatory form of arthritis. (AR 184,

14  204.) On September 16, 1997, plaintiff noted that she increased her Ibuprofen and "usually is sleeping

15  adequately and feels Elavil is still effective."  (AR 183, 203.)  Dr. Watrous noted mild to moderately

16  tender fibromyalgia tender points, assessed fibromyalgia and decided to try Naprosyn.  (AR 183, 203.)

17  On December 16, 1997, plaintiff reported "that the exercise has been helpful" and that she "is sleeping

18  better with Elavil" and "takes Ibuprofen occasionally."  (AR 182, 202.)  Dr. Watrous noted mild

19  fibromyalgia tender points, assessed fibromyalgia, continued Elavil and Ibuprofen, and asked plaintiff

20  to return in six months.  (AR 182, 202.)

21        On April 7, 1998, plaintiff noted she is not sleeping with Elavil, experienced stress and was

22  forced to attend school for the GAIN program.  (AR 181, 200.)  Dr. Watrous noted moderate

23  fibromyalgia tender points, assessed fibromyalgia, began Ambien 5 mg, and "signed papers to excuse

24  her from the GAIN Program as I do believe she's permanently disabled." (AR 181, 200.)  Dr. Watrous

25  completed an April 7, 1998 check off form to note plaintiff is incapacitated to engage in work, training

26  and/or provide necessary care for her children. (AR 180, 201, 418.) Dr. Watrous noted his fibromyalgia

27

28        [2]      The Commissioner stipulates that the ALJ fairly and accurately summarized the relevant medical reports
    in his December 9, 2003 decision.

diagnosis with a 1987 onset and permanent expected duration.  (AR 180, 201, 418.)

On July 7, 1998, plaintiff noted that she "is sleeping much better on Ambien and feels rested" and "is functioning much better at home." (AR 179, 199.)  Dr. Watrous noted mild fibromyalgia tender points, assessed fibromyalgia, and asked plaintiff to return in three months.  (AR 179, 199.)  On November 17, 1998, Dr. Watrous noted that a change from Ibuprofen to Arthrotec "is not very helpful for her fibromyalgia." (AR 176, 198.)  Dr. Watrous further noted mild to moderate fibromyalgia tender points and assessed fibromyalgia.  (AR 176, 198.)  Dr. Watrous asked plaintiff to return in three months. (AR 176, 198.)

On February 16, 1999, Dr. Watrous noted that plaintiff has no ulcer symptoms and "only mild to moderately tender fibromyalgia tender points." (AR 197.)  Dr. Watrous assessed fibromyalgia, prescribed Ibuprofen and Ambien, and asked plaintiff to return in six months.  (AR 197.)  On August 17, 1999, Dr. Watrous noted plaintiff's "intermittent difficulties usually not requiring the ibuprofen" and mild fibromyalgia tender points.  (AR 260.)  Dr. Watrous continued plaintiff's medications and asked her to return in six months.  (AR 260.)  On October 5, 1999, Dr. Watrous noted plaintiff's "increasing stiffness and soreness of her muscles," driving difficulty and in turn muscle cramps.  (AR 259.)  Dr. Watrous found moderately tender fibromyalgia tender points and asked plaintiff to return in three months.  (AR 259.)

On March 21, 2000, Dr. Watrous noted plaintiff stopped taking Paxil because of sleep disturbances, is not tolerating Ibuprofen and has increased pain.  (AR 259.)  Dr. Watrous noted moderate fibromyalgia tender points, assessed fibromyalgia and depression, and asked plaintiff to return in three months.  (AR 258.)  On June 6, 2000, Dr. Watrous noted increased pain and swelling in plaintiff's wrists, MCPs, knees and ankles.  (AR 256.)  Dr. Watrous found mild tenderness in wrists, shoulders, knees and ankles but no effusions.  (AR 256.)  Dr. Watrous assessed polyarthritis, possible rheumatoid arthritis or lupus vs. fibromyalgia, and depression.  (AR 256.)  Dr. Watrous asked plaintiff to return in a month.  (AR 256.)  On July 18, 2000, Dr. Watrous noted plaintiff stopped taking Prozac because of mouth dryness, seeks disability benefits, and continues to have diffuse pains.  (AR 255.)  Dr. Watrous found mild tenderness in fibromyalgia tender points and assessed fibromyalgia and depression.  (AR 255.)  Dr. Watrous asked plaintiff to return in three months and stated: "I will not place her on disability

1  or give her an excuse from employment training." (AR 255.) On October 17, 2000, Dr. Watrous noted

2  plaintiff continues to have diffuse, aching pains and to seek disability benefits. (AR 262.) Dr. Watrous

3  noted mild tenderness and fibromyalgia tender points diffusely and assessed depression and

4  fibromyalgia. (AR 262.) Dr. Watrous asked plaintiff to return in three months and stated: "I filled out

5  a form stating that she can go to a classroom as long as she has breaks every hour." (AR 262.)

6      On May 1, 2001, Dr. Watrous noted plaintiff's diffuse aching and soreness of joints and mild

7  tenderness in the fibromyalgia tender points diffusely. (AR 257, 499.) Dr. Watrous assessed depression

8  with anxiety and fibromyalgia. (AR 257, 499.) Dr. Watrous discussed with plaintiff "that I'm closing

9  this clinic to all rheumatology patients unless they are on immunosuppressive medications for

10  autoimmune disorders. I've not made a return appointment for her." (AR 257, 499.)

11              ***Ramonchito Menor, M.D., Treating Physician***

12      Plaintiff treated with Ramonchito Menor, M.D. ("Dr. Menor"). On October 21, 1998, plaintiff

13  complained of right abdomen pain. (AR 193.) On October 20, 1998, plaintiff complained of persistent

14  abdomen pain. (AR 192.) On November 25, 1998, plaintiff denied abdomen pain but complained that

15  her stomach hurt. (AR 191.) On December 7, 1998, plaintiff complained of abdomen pain and bloody

16  bowel movements. (AR 190.) On December 21, 1998, plaintiff complained of itchy and burning in her

17  rectum. (AR 189.) On January 20, 1999, plaintiff noted she "feels a lot better" after Dr. Menor had

18  performed a rectum fissure surgery. (AR 188.) As of March 12, 1999, plaintiff's rectal fissures had

19  improved. (AR 196.)

20                  ***Family Health Care Network***

21      May 12, 1998 notes reflect plaintiff requested a handicap license plate. (AR 171.) Plaintiff

22  complained that her fibromyalgia becomes "aggravated" to prevent her to walk, she becomes stiff at

23  times, and experiences insomnia. (AR 171.) The need for plaintiff to walk and exercise was enforced.

24  (AR 171.) On October 1, 1999, plaintiff complained of multiple bone and muscle joint aches and pains

25  and sought renewal of medications. (AR 234.)

26                  ***Sierra View District Hospital***

27      To address severe rectal bleeding and pain from a fissure, plaintiff underwent a successful lateral

28  internal sphincterotomy on January 12, 1999.

1       On May 3, 2000, plaintiff presented to the emergency room because of pain from waist to legs

2   and to her arms. (AR 239, 240.) Plaintiff was diagnosed with fibromyalgia and treated with medication.

3   (AR 237, 239.)

4       On July 2, 2001, plaintiff presented to the emergency room and complained of body aches. (AR

5   369.) Plaintiff was diagnosed with fibromyalgia excerbation and was given Morphine 6 mg and

6   Phenergam 25 mg. (AR 372.) On July 20, 2001, plaintiff presented to the emergency room and

7   complained of "pain all over body" and was diagnosed with fibromyalgia. (AR 362, 365.) On August

8   27, 2001, plaintiff presented to the emergency room and complained of body aches. (AR 353.)

9   ***Michael S. Barnett, M.D., Consultative Psychiatrist***

10       Michael S. Barnett, M.D. ("Dr. Barnett"), a board certified psychiatrist, conducted a psychiatric

11   evaluation of plaintiff and prepared a July 1, 1999 report. (AR 205.) Plaintiff's chief complaint was that

12   she has "a lot of depression" since her husband left in January 1999. (AR 206.) Dr. Barnett noted

13   plaintiff "did not appear chronically mentally ill and assessed:

> This woman is extremely low functioning, and she has no occupational skills and very
> little education. It appears to me that she is having a depressive reaction due to the loss
> of her husband, and that her level of functioning probably has not decreased all that much
> since he has left, it is just that she has always been low functioning and he has
> compensated for her. I think she is under financial distress, and difficulty in raising her
> family. I think she has an adjustment disorder with a depressed mood.
>
> Although this woman is low functioning, and her mental status exam is poor and she
> does have symptoms of depression, I do not feel that this is a significant change in her
> level of functioning other than a moderate increase in depression. Therefore, I do feel
> if she is given a simple enough task, she could follow it. She could attend work on a
> regular basis, and could perform consistently without assistance, if the task was sufficient
> to her education level. She does not have any symptoms that would interfere with a
> normal work day or work week, and at a very primitive level, in her own language, she
> could relate with peers, customers, and supervisors. If the job was not too stressful, I do
> believe she could manage the stress of a normal work week. (AR 207.)

23       Dr. Barnett conducted a second psychiatric evaluation and prepared a January 19, 2001 report.

24   Dr. Barnett noted that plaintiff "did not appear chronically mentally ill" and that plaintiff's "last

25   employment was three years ago, when she sold vegetables and corn at a fruit stand for eight or nine

26   years. She stopped when she developed her fibromyalgia." (AR 289.) Plaintiff chiefly complained of

27   "pains in my bones" and that her pain depresses her. (AR 289.) Dr. Barnett further noted that plaintiff

28   awakes "midcycle about three or four nights a week because of her pain." (AR 289-290.) Dr. Barnett

found plaintiff "appeared slightly improved from her last examination" and "appeared depressed." (AR 290.)  Dr. Barnett diagnosed adjustment disorder with depressed mood and assessed that plaintiff is "focused on her physical problems and struggles with her children." (AR 290.)  Dr. Barnett concluded:

> Therefore, she would be able to work in a simple job.  She would be able to understand, carry out and remember simple instructions.  She would be able to respond appropriately to co-workers, supervisors and the public in a routine work setting.  She would be able to respond to usual work situations or stressors in an appropriate fashion and deal with changes in a routine work setting.  She would be able to work an eight-hour day, attend work regularly and perform work duties consistently without special or additional supervision. (AR 291.)

### Frederick R. Young, M.D., Consultative Orthopaedic Surgeon

Frederick R. Young, M.D. ("Dr. Young"), an orthopaedic surgeon, conducted a June 22, 1999 consultative examination of plaintiff and noted that plaintiff complained of pain in her back radiating to her neck and arms. (AR 209.)  Dr. Young found plaintiff in no acute distress and concluded: "At this point it's felt this patient's exam shows morbid obesity with no objective findings of her muscular skeletal system." (AR 211.)

Dr. Young conducted a January 29, 2001 consultative examination during which plaintiff stated that "she has had pain since 1987 and these are aches and pains throughout her whole body; her bones specifically but also her joints." (AR 293.)  Dr. Young's examination revealed neither swelling nor tenderness to plaintiff's wrists, no swelling of metacarpophalangeal, PIP or DIP hand joints, full hand joint range of motion, no hip pain with range of motion, neither swelling nor tenderness to plaintiff's knees, and plaintiff's normal gait. (AR 294.)  Dr. Young noted that plaintiff "did not produce maximal effort with this exam." (AR 294.)  Dr. Young concluded: "The patient is felt to have morbid obesity but we are unable to appreciate any musculoskeletal deformities of significance." (AR 294.)

### Physical Residual Functional Capacity Assessment

Wallace D. Campbell, M.D. ("Dr. Campbell"), prepared a July 22, 1999 Physical Residual Functional Capacity Assessment to conclude that plaintiff is able to: (1) lift/carry 20 pounds occasionally and 10 pounds frequently; (2) Stand/walk about six hours in an eight-hour workday; (3) sit about six hours in an eight-hour workday; and (4) push/pull subject to the lift/carry limitations. (AR 213.)  Dr. Wallace found neither postural, manipulative, visual, communicative nor environmental limitations.

1  (AR 214-216.)

2      Brian Ginsberg, M.D. ("Dr. Ginsberg"), completed an October 19, 2000 Physical Residual

3  Functional Capacity Assessment to conclude that plaintiff is able to: (1) lift/carry 20 pounds occasionally

4  and 10 pounds frequently; (2) stand/walk about six hours in an eight-hour workday; (3) sit about six

5  hours in an eight-hour workday; and (4) push/pull subject to the lift/carry restrictions.  (AR 264.)  Dr.

6  Ginsberg found neither postural, manipulative, visual, communicative nor environmental limitations.

7  (AR 265-267.)

8      Ernest Wong, M.D. ("Dr. Wong"), completed a February 28, 2001 Physical Residual Functional

9  Capacity Assessment to conclude plaintiff is able to: (1) lift/carry 20 pounds occasionally and 10 pounds

10  frequently; (2) stand/walk about six hours in an eight-hour workday; (3) sit about six hours in an eight-

11  hour workday; and (4) push/pull subject to the lift/carry restrictions.  (AR 331.)  Dr. Wong found neither

12  postural, manipulative, visual, communicative, nor environmental limitations.  (AR 332-334.)  On June

13  8, 2001, Dr. Ginsberg affirmed Dr. Wong's assessment.  (AR 337.)

14                    ***Psychiatric Review Technique***

15      Evelyn Aquino-Caro, M.D. ("Dr. Aquino-Caro"), completed an August 31, 1999 Psychiatric

16  Review Technique to conclude plaintiff has adjustment disorder with depressed mood.  (AR 222.)  Dr.

17  Aquino-Caro noted neither organic mental disorders, schizophrenic, paranoid or other psychotic

18  disorders, mental retardation and autism, anxiety related disorders, somatoform disorders, personality

19  disorders, nor substance addiction disorders.  (AR 224-228.)  Dr. Aquino-Caro concluded plaintiff has

20  generally slight restriction of daily living activities, difficulties in maintaining social functioning, and

21  deficiencies of concentration, persistence or pace.  (AR 229.)

22      Evengeline Murillo, M.D. ("Dr. Murillo"), completed an October 23, 2000 Psychiatric Review

23  Technique to conclude a medically determinable impairment is present but does not satisfy diagnostic

24  criteria.  (AR 274.)  Dr. Murillo commented:

25      Depression allegations are only supported by the fact that the [claimant] is taking meds
       but there is no [history] of [treatment with a] psychiatrist.  The findings to support
26      fibromyalgia are of mild tenderness in the trigger [points and the treating source] would
       not place his patient on disability or give an excuse for not going to employment training.
27      It appears that an RFC of Light would be reasonable due to the pain [and] findings of
       mild tenderness in the trigger [points].  There is no psych [history] so it would be
28      considered non-severe.  (AR 286.)

                                      8

Dr. Ginsberg agreed with Dr. Murillo's assessment.  (AR 286.)

Dr. Murillo completed a March 1, 2001 Psychiatric Review Technique to conclude plaintiff has adjustment disorder with depressed mood.  (AR 295.)  Dr. Murillo concluded plaintiff has mild restriction of daily living activities, difficulties maintaining social functioning, and difficulties maintaining concentration, persistence or pace. (AR 305.)  Dr. Murillo concluded that plaintiff would be able to perform and get along in the workplace and that plaintiff should be able to perform light work. (AR 310.)

Dr. Murillo completed a March 1, 2001 Mental Residual Functional Capacity Assessment to conclude generally that plaintiff is not significantly limited in understanding and memory, sustained concentration and persistence, social interaction and adaptation.  (AR 338-339.)  On June 8, 2001, Dr. Ginsberg affirmed Dr. Murillo's assessment.  (AR 340.)

Dr. Aquino-Caro completed an undated Mental Residual Functional Capacity Assessment to conclude generally that plaintiff is not significantly limited in understanding and memory, sustained concentration and persistence, social interaction and adaptation.  (AR 344-345.)

### *Sequoia Family Medical Center*

Plaintiff treated at Sequoia Family Medical Center in Porterville.  On January 16, 2001, plaintiff complained of upper back and right shoulder pain.  (AR 405.)  On February 20, 2001, plaintiff complained of pains from fibromyalgia. (AR 403.) On February 27, 2001 and April 10, 2001, plaintiff complained of constant back pain. (AR 402.) April 7, 2001 notes reflect plaintiff's anxiety attacks. (AR 399.)  On April 9, 2001, plaintiff complained of body irritation and body aches. (AR 398.)  On May 3, 2001, plaintiff complained of back and arm pain.  (AR 321.)  On May 4, 2001, plaintiff complained of headaches, nausea and dizziness.  (AR 320.)  May 14, 2001 notes reflect plaintiff was anxious and fearful. (AR 319.)  On May 17, 2001, plaintiff complained of pain over her entire back from neck down. (AR 317.)  On May 18, 2001, plaintiff complained of pain over her entire body and sleeplessness.  (AR 316.)  On May 19, 2001, plaintiff indicated she felt a little better.  (AR 315.)

On June 14, 2001, plaintiff complained of pain from her neck to lower back, stiffness, and sitting and standing problems.  (AR 392.)  On June 28, 2001, plaintiff complained of neck, shoulder and back pain.  (AR 387.)  On July 12, 2001, plaintiff noted her trouble sleeping.  (AR 386.)  On September 5,

1    2001, plaintiff complained of nausea, hurt eye and sweat.  (AR 379.)  An October 3, 2001 Application

2    for Disabled Person Placard or Plates was completed for plaintiff.  (AR 377.)  On October 31, 2001,

3    plaintiff claimed she had noticed blotches around both her knees.  (AR 417.)  On November 27, 2001,

4    plaintiff complained of painful burning bowel movements.  (AR 414.)

5           On January 29, 2002, plaintiff complained of back stiffness.  (AR 412.)  On January 31, 2002,

6    plaintiff complained of stiffness to her left side from her shoulders to lower back.  (AR 411.)  On

7    February 12, 2002, plaintiff complained she was not sleeping "at all."  (AR 407.)  On March 1, 2002,

8    plaintiff complained of sleep inability.  (AR 495.)  On March 11, 2002, plaintiff complained of insomnia.

9    (AR 406.)  On May 23, 2002, plaintiff complained of mood swings.  (AR 494.)  On October 14, 2002,

10   plaintiff complained of body pain.  (AR 492.)

11          On January 9, 2003, plaintiff complained of "body aches, pain all over."  (AR 489.)  On May 20,

12   2003, plaintiff complained of arthritis pain all over her body.  (AR 498.)  On June 3, 2003, plaintiff

13   complained of muscle and joint pain.  (AR 497.)

14                           ***Medical Source Statement Form***

15          Jasvir Sidhu, M.D. ("Dr. Sidhu"), and Cynthia Rowell, FNP/PA ("Ms. Rowell"), completed a

16   May 10, 2002 Medical Source Statement Form Assessment of Functional Capacity to note that plaintiff

17   has impairments/restrictions to limit her ability to perform work related activities.  (AR 433.)  Dr. Sidhu

18   and Ms. Rowell concluded plaintiff is able to: (1) lift/carry less than 10 pounds; (2) stand/walk less than

19   two hours in an eight-hour workday; (3) sit less than six hours during an eight-hour workday; (4)

20   occasionally bend; and (5) occasionally drive automotive equipment.  (AR 433-435.)  Dr. Sidhu and Ms.

21   Rowell noted that plaintiff is unable to: (1) use her hands for repetitive action; (2) squat, crawl, climb,

22   reach above, stoop, crouch and kneel; and (3) use feet for repetitive movements.  (AR 434-435.)  As to

23   objective signs of pain, Dr. Sidhu and Ms. Rowell referenced "facial grimacing, apparent pain in

24   multiple areas during test efforts."  (AR 435.)  Dr. Sidhu and Ms. Rowell concluded plaintiff's pain is

25   severe and would constantly interfere with attention and concentration.  (AR 436.)

26                           ***Don Uttenreither, Physical Therapist***

27          Don Uttenreither ("Mr. Uttenreither"), a physical therapist, prepared a May 10, 2002 report to

28   note that plaintiff "appeared to be mildly unstable during ambulation around the office but she never lost

1    balance.  She was able to walk distances of 40-50 feet at a time with and without her single post cane."

2    (AR 437.)  As to a computerized grip strength test, Mr. Uttenreither found the results "show invalid

3    effort."  (AR 438.)  Another grip test revealed plaintiff "has given undetermined efforts."  (AR 439.)

4    As to lifting, Mr. Uttenreither noted:

5        This patient was unable to perform functional lifting.  She was unable to lift an empty
         box (9 pounds) more than one time to waist level.  She was unable to carry the box.  She
6        is unable to Push or Pull a 30# sled more than 4-5 feet before stopping.  (AR 440.)

7    As to work activities, Mr. Uttenreither commented:

8        This patient was able to complete Bending to an Occasional level and Grasping to an
         Occasional, but with weakness of grip and pinch as noted.  She is unable to do any
9        squatting, climbing, kneeling, stooping or kneeling.  She is able to reach upward to an
         occasional level but with pain in both shoulders and instability to perform more than 3
10       repetitions.  (AR 440.)

11   Mr. Uttenreither noted plaintiff "was observed sitting for up to 30 minutes and walking about 60-90

12   seconds at a time" and "appeared to fatigue quickly."  (AR 440.)  Mr. Uttenreither characterized

13   plaintiff's reliability as "undetermined" and concluded:

14       This patient is functioning within a high level of pain perception.  She continues to drive
         and remain mobile.  She continues to care for her appearance and personal needs despite
15       the pain levels.  (AR 441.)

16       In response to the ALJ's August 11, 2003 letter seeking clarification of results, Mr. Uttenreither

17   noted that as to computerized grip testing:

18       The results do show an invalid effort as seen by the reverse curve on the graph.  The
         reason for the invalid effort may be for reasons of pain, apprehension of pain, general
19       anxiety or by willful attempt to show an effort that was not representative of her full
         abilities.  The test, in itself, does not determine which of these reasons, or possibly other
20       reasons, may be the cause of the invalid effort.  The test only shows that the results of
         this particular test are Invalid and can not be used to accurately determine this patient's
21       true ability for this task.  (AR 481; underling in original.)

22   As to the other grip testing, Mr. Uttenreither explained:

23       I find this a very unlikely scenario, since it only requires several pounds of force to be
         exerted on the grip dynamometer to make a recorded trial, but this is what occurred.
24       Why she was unable to grip hard enough to record on 9 of 10 trials is the question.

25       As you can see, her efforts placed her in the zero percentile for grip strength for her age
         and gender and she is classified in the Moderate/Severe Deficiency category.  Yet, you
26       will notice that I noted under Physical Findings that she ambulates with a single post
         cane, a task that requires a Fair to Good grip ability, at least in the hand holding the cane.
27       She also was able to grasp the handles of a sled that weighed 30 pounds and pull it for
         5 feet in the Dynamic Lifting, a task that would seem to require more grip strength than
28       she demonstrated during the actual 5 Position Grip testing and the Rapid Exchange Grip

1    test.  (AR 482; underlining in original.)

2    Plaintiff further commented that plaintiff exceeded "her stated abilities for sustained sitting, but by a

3    fairly small amount."  (AR 482.)  Mr. Uttenreither explained "that the results produced by this patient

4    were not consistently valid, and as such are not completely reliable in efforts to determine her true

5    physical capabilities" and "the diagnosis of fibromyalgia does not necessarily preclude someone from

6    working or does not necessarily dictate either partial or full disability."  (AR 482.)

7                                              *Medications*

8         Plaintiff's medications have included Ibuprofen 600 mg, Ambien 5 mg, Paxil 20 mg, Vioxx,

9    Vicodin, Dphenhydramine 50 mg, Glucosamine, Effexor, and Neurontin. (AR 99, 107, 131, 165, 475.)

10                          **Plaintiff's Activities And Testimony**[3]

11                                   *Reports And Questionnaires*

12        Plaintiff completed an April 7, 1999 Disability Report Adult to note that she speaks Spanish and

13   is unable to speak, read or write more than her name in English.  (AR 93.)  Fibromyalgia limits her

14   ability to work, and plaintiff's joints hurt most of the time and she awakes stiff.  (AR 94.)

15        Plaintiff completed an April 28, 1999 Daily Activities Questionnaire to indicate that she takes

16   muscle relaxants to assist with sleep and needs no grooming assistance.  (AR 104.)  Plaintiff's daughter

17   cooks and shops for plaintiff.  (AR 104.)  Plaintiff does not perform household chores because she tires

18   quickly and incurs joint pain.  (AR 104.)  According to plaintiff, "there are no activities that I can do."

19   (AR 104.)  Plaintiff does not feel well enough to visit friends.  (AR 106.)  Plaintiff's medication causes

20   fatigue.  (AR 107.)

21        Plaintiff's daughter Claudia Harlien ("Ms. Harlien") completed an April 28, 1999 Daily

22   Activities Questionnaire (Third Party Information) to note that on a typical day, plaintiff cares for her

23   children, waters the yard and attempts house work before tiring.  (AR 109, 111.)  Plaintiff "can never

24   finish a task, like washing dishes."  (AR 111.)  Extreme joint pain limits plaintiff to four hours sleep at

25   night.  (AR 109.)  Plaintiff requires no assistance for dressing or grooming.  (AR 110.)  Plaintiff's

26   daughter prepares meals.  (AR 110.)  Plaintiff needs no assistance to go out.  (AR 111.)  Plaintiff can

27

28        [3]    The Commissioner stipulates that the ALJ fairly and accurately summarized the relevant testimony in his
     December 9, 2003 decision.

                                                  12

1   read neither Spanish nor English.  (AR 112.)

2      Plaintiff completed an April 28, 1999 Fatigue Questionnaire to note that on an average day she

3   gets up, eats and waters her garden.  (AR 116.)  Plaintiff's fatigue arose 10 years ago and has worsened.

4   (AR 116.)  Plaintiff cannot do household chores because her hands tire and hurt.  (AR 116.)  Hand pain

5   affects plaintiff's driving.  (AR 116.)  Plaintiff stops when she tires from performing chores, and her

6   arms and legs swell if she over does it.  (AR 116.)  Plaintiff is able to maintain her concentration to

7   finish tasks.  (AR 117.)

8      Plaintiff completed an April 28, 1999 Pain Questionnaire to claim her pain arose 10 years ago

9   in her joints to cause stiffness.  (AR 118.)  Her pain has spread to her hands, arm, legs, back and neck,

10  and she suffers pain everyday.  (AR 118.)  Yard work and long walks cause plaintiff pain.  (AR 118.)

11  At times, rest relieves the pain.  (AR 118.)  Medication relieves pain and causes no side effects.  (AR

12  118.)  Pain first affected plaintiff's activities three years ago.  (AR 119.)  Plaintiff is able to walk a short

13  distance, stand and sit 15 minutes, drive her car, and perform light housekeeping.  (AR 120.)

14     Plaintiff completed an August 8, 2000 Disability Report Adult to note she is 5-foot-2 and weighs

15  207 pounds.  (AR 125.)  Plaintiff speaks Spanish and can neither speak, read nor write in English.  (AR

16  125.)  Plaintiff's ability to work is limited by fibromyalgia, severe muscle pain, sleep deprivation, muscle

17  pain and drowsiness from medication.  (AR 126.)  Plaintiff claims that her conditions started to bother

18  her in 1987 and that she became unable to work in January 2000 although plaintiff has never worked.

19  (AR 126.)

20     Plaintiff completed a September 18, 2000 Daily Activities Questionnaire to note that on an

21  average day, plaintiff dresses, picks up "basic things around the house" without doing too much to avoid

22  severe muscle pain.  (AR 143.)  Plaintiff cannot sleep "any more," and medication at time helps with

23  sleep.  (AR 143.)  Plaintiff is able to dress and groom herself.  (AR 143.)  Plaintiff grocery shops twice

24  a month with her daughter.  (AR 144.)  Plaintiff cannot read Spanish well.  (AR 144.)  Plaintiff needs

25  assistance to go out because she hardly ever feels well.  (AR 144.)  For entertainment, plaintiff watches

26  television, listens to the radio and waters her plants.  (AR 145.)  Plaintiff is unable to work because she

27  "never" gets enough sleep, her body hurts "everyday," and her feet swell.  (AR 146.)

28     Ms. Harlien completed an undated Daily Activities Questionnaire (Third Party Information) to

1   note that on a typical day, plaintiff gets dressed, waters her plants, listens to the radio, and watches the

2   news. (AR 147.) Plaintiff does not have normal sleeping hours and can go days without sleep to cause

3   exhaustion and muscle pain. (AR 147.) Plaintiff has been "on almost every sleeping pill there is." (AR

4   147.) Plaintiff's daughters do all her cooking and cleaning. (AR 148.) Plaintiff needs to go to the

5   emergency room if she does chores. (AR 148.) Plaintiff does not drive because she stiffens and may

6   get into a collision. (AR 148.) Medications make plaintiff dizzy and drowsy. (AR 150.) Plaintiff has

7   been on many different anti-depressants which cause side effects. (AR 150.)

8          Plaintiff completed a May 9, 2001 Reconsideration Disability Report to note that medication has

9   no effect on her immune system and that she has diabetes. (AR 157.) Plaintiff has been put on a diet

10  and exercise for diabetes but pain causes difficulty to follow the plan. (AR 157, 159.) Plaintiff notes

11  one of her treating doctors told her "there was nothing more he could do for her and told her to find a

12  different Dr." (AR 159.) Plaintiff further noted a second doctor stopped treating her and did not make

13  a referral "because he said he doesn't make them." (AR 159.)

14         In an undated statement, plaintiff noted she made two emergency room visits for severe pain and

15  muscle tightness that prevents mobility. (AR 164.) No medication has worked, and the degree of

16  discomfort and pain has increased. (AR 164.)

17                         ***Plaintiff's July 11, 2002 Hearing Testimony***

18         At the July 11, 2002 ALJ hearing, plaintiff testified that she is unable to read or write in English,

19  is able to understand a bit of spoken English, and is unable to correctly read and write in Spanish. (AR

20  514.) During weekends, plaintiff assisted at her husband's fruit and vegetable stand where she put ears

21  of corn into bags and took money from customers. (AR 516.) Plaintiff's husband left her in 1999 when

22  she got sick and needed an operation. (AR 517.) Plaintiff became a United States citizen in 1997 after

23  she overheard women at adult school talking about citizenship. (AR 517.)

24         Early in her testimony, plaintiff stood because she was "having a very bad day" and her body was

25  "trembling or shaking." (AR 518.) Plaintiff cannot work because she has pain in her legs, back and

26  arms and her head "feels like it's real heavy." (AR 518, 519.) Plaintiff feels burning in her arms for

27  years. (AR 519.) Plaintiff uses a cane because she cannot walk well and gets tired. (AR 519.) Plaintiff

28  is able to walk only a "very short distance" and can walk up to 20 minutes with a cane before she needs

1   to sit down although she can go short distances in her home without her cane.  (AR 519-520.)  Plaintiff

2   does not "pick up or carry anything" and is unable to hold a large mug of coffee or a gallon of milk.  (AR

3   522.)  At times, plaintiff needs her daughters' assistance to dress and undress.  (AR 522.)

4          Dr. Watrous diagnosed plaintiff's fibromyalgia which has worsened to cause pain in her bones

5   and damage to her muscles.  (AR 524.)  The pain has worsened to the point she needs to go to the

6   emergency room once a month for an injection which helps some.  (AR 524.)  Pain medication takes

7   some pain away but causes liver pain.  (AR 525.)  Side effects include a heavy body feeling, a bitter taste

8   in her month, and itching.  (AR 525.)

9          Plaintiff lies down two or three times a day for an hour and sometimes sleeps.  (AR 525.)

10  Plaintiff needs pills to sleep at night and takes Ambien which causes her "to forget a lot of things."  (AR

11  526.)  Plaintiff has diabetes and takes oral medication for it, not insulin.  (AR 524.)  Plaintiff takes Paxil

12  for her depression and anxiety and has seen a psychologist.  (AR 521.)

13         Plaintiffs lives with her seven children ranging in ages 12 to 21.  (AR 520.)  Plaintiff waters her

14  plants by dropping a running hose near them.  (AR 526.)  Plaintiff performs no household chores and

15  has not done so for five years because she is unable to lift anything big.  (AR 526.)  Plaintiff attends

16  church every four months but can neither sit nor kneel.  (AR 527.)  If plaintiff knelt to the floor, she

17  would be unable to get up.  (AR 527.)  Plaintiff initially states he unable to drive her children to school

18  daily but later notes at times she takes her son to school and her daughters to the store and doctors.  (AR

19  528.)  Plaintiff goes out of her house two or three times a week to visit her daughter and brother.  (AR

20  529.)  Two years ago, plaintiff rode in a car to her mother's funeral in Mexico and was in "real bad

21  shape" when she returned.  (AR 531.)

22         Plaintiff eats fast food daily.  (AR 529.)  At times, plaintiff grocery shops with her daughters but

23  tires and sits in chairs.  (AR 530.)

24         ***July 11, 2002 Hearing Testimony Of Plaintiff's Daughter Juanita Magdaleno***

25         At the July 11, 2002 ALJ hearing, plaintiff's daughter Juanita Magdaleno ("Juanita") testified

26  that she lives with plaintiff and Juanita's three sisters and two brothers.  (AR 532.)  Juanita observes

27  plaintiff's pain from plaintiff's facial expressions, movements, sighing, holding her elbow, and use of

28  her cane.  (AR 532-533.)  Sometimes, plaintiff's legs give out to cause her to fall.  (AR 533.)  Plaintiff

1    uses her cane "all the time." (AR 533.)

2        Juanita cooks for plaintiff who never cooks. (AR 533, 535.) After plaintiff tries to perform

3    household chores, she is unable to get up the next day and will in bed "for a week without being able

4    to move or do anything." (AR 534.) When plaintiff attempted to load clothes into a washer and dryer,

5    she was unable to move the next day. (AR 536.) Plaintiff is unable to feed her pet birds or to clean their

6    cages. (AR 536.) Plaintiff drives when necessary to pick up her son or in an emergency. (AR 535.)

7    When plaintiff turns when driving, she remains stiff and requires "a couple of seconds" to "move back

8    into place." (AR 535.) Plaintiff has been taken to the emergency room for a Demerol shot for her pain.

9    (AR 536.)

10       With her younger children, plaintiff talks to them but is unable to assist with their homework.

11   (AR 535.) Juanita denies that plaintiff leaves plaintiff's home except to see plaintiff's eldest daughter

12   and a son. (AR 537.) The only help plaintiff needs with dressing is putting on shoes, attaching buttons

13   and pulling up shirts over plaintiff's head. (AR 538.) Plaintiff lies down two or three times a day for

14   an hour at a time. (AR 539.) Plaintiff gets up after sitting and walks in her house with her cane. (AR

15   539.) Plaintiff has gotten worse because unlike two years ago, plaintiff is unable to cook and "do

16   everything herself." (AR 541.)

17                              ***Plaintiff's August 6, 2003 Hearing Testimony***

18       Plaintiff testified at the August 6, 2003 supplemental ALJ hearing that since the July 11, 2002

19   hearing, her condition "seems to get worse every day, and especially to stand after sitting. When I stand

20   up the pain is worse. And my feet feel like they're splitting open." (AR 547.) Plaintiff always has pain

21   in all joints and muscles (but the ALJ noted plaintiff motioned to her upper extremities). (AR 548-549.)

22   Plaintiff requires a cane. (AR 547.) Plaintiff's daughters assist plaintiff to dress, including putting arms

23   in and out of sleeves and putting on shoes. (AR 548.)

24       Plaintiff has difficulty to lift and carry things and drinks out of styrofoam cups in small

25   quantities. (AR 549.) If plaintiff could pick up a gallon of milk, she would drop it because she has no

26   hand strength. (AR 549.)

27       Plaintiff believes she can sit or stand only 10 minutes because her feet feel as if they are splitting

28   apart. (AR 550.) Plaintiff lies down several times a day for up to an hour and passes her days sitting,

lying down and walking a while. (AR 550-551.) Sometimes plaintiff sleeps when she lies down. (AR 551.) Plaintiff has put her mattress on the floor because she could not get on her bed and she had fallen out of bed. (AR 551.) She cannot make her bed anymore. (AR 551.)

### *August 6, 2003 Hearing Testimony Of Plaintiff's Daughter Juanita Magdaleno*

At the August 6, 2003 supplemental ALJ hearing, Juanita testified that she continues to live with plaintiff. (AR 552.) In the past year, plaintiff has worsened in that she gets up stiff and experiences constant severe pain to require plaintiff to take more than one Vicodin. (AR 552.) Plaintiff is unable to sit or stand for an extended time. (AR 553.) Plaintiff needs to lie down "constantly" because Vicodin makes her drowsy and knocks her out. (AR 553, 555.) Juanita quantifies that she has observed plaintiff lie down four or five times. (AR 554.) If plaintiff takes more than two Vicodin, plaintiff "can be out like the whole day and probably half of the next." (AR 555.) She is in such a condition three or four days a week. (AR 556.) When plaintiff takes more than two Vicodin a day, she has to be roused. (AR 556.) Plaintiff is unable to hold babies because her arms may give out and she may drop the baby. (AR 554.) Plaintiff requires more help to dress, and Juanita provides the help. (AR 554.) When plaintiff tries to cook, she gets burned because she drops utensils in or spills cooking oil. (AR 557.) Plaintiff's daughters prepare plaintiff's meals. (AR 558.)

### *Testimony Of Vocational Expert Thomas Dashalet*

Vocational expert Thomas Dashalet ("Mr. Dashalet") testified at the August 6, 2003 supplemental ALJ hearing. As a first hypothetical, the ALJ asked Mr. Dashalet to assume: (1) age of 44; (2) fifth grade Mexican education; (3) no past relevant work history; (4) inability to read or write in English; (5) ability to lift/carry 10 pounds occasionally and frequently; (6) ability to stand less than two hours; (7) ability to sit continuously without breaks for less than two hours; (8) inability to use hands for repetitive action; (9) ability to bend occasionally; (10) inability to squat, climb, crawl, reach above, stoop, crouch or kneel; (11) inability to use hands or feet for repetitive motions; (12) inability to tolerate exposure to unprotected heights; (13) ability to tolerate occasional exposure to moving machinery, driving automotive equipment, dust and fumes, and noise; (14) preclusion of activity precipitating severe pain; and (15) pain causing interference with attention and concentration constantly. (AR 565.) Mr. Dashalet opined there are no existing jobs at any exertional level with such limitations. (AR 565.)

As a second hypothetical, the ALJ asked Mr. Dashalet to assume: (1) age of 44; (2) fifth grade Mexican education; (3) no past relevant work history; (4) ability to do simple work at any exertional level; and (5) limitation to simple, repetitive tasks.  (AR 566.)  Mr. Dashalet opined that with such limitations, the whole world of unskilled work is available.  (AR 566.)

As a third hypothetical, plaintiff's attorney asked Mr. Dashalet to assume; (1) age of 44; (2) fifth grade Mexican education; (3) no past relevant work history; (4) ability to sit 10 minutes at a time then need to alternate to standing 10 minutes at a time; (5) need to lie down five unscheduled times a day for 15 minutes to an hour; and (6) ability to lift/carry at a sedentary level.  (AR 566-567.)  Mr. Dashalet opined there is no work in the national economy for a person with such limitations.  (AR 567.)

### The ALJ's Findings

In his December 9, 2003 decision, the ALJ identified the primary issue as whether plaintiff is under a disability.  (AR 19.)  In determining plaintiff is not disabled, the ALJ found:

1. Plaintiff's adjustment disorder with depressed mood is a severe impairment but does not meet or medically equal an impairment listed in the Listing of Impairments, 20 C.F.R. Part 404, Subpart P, Appendix 1 ("Listing of Impairments").

2. Plaintiff's allegations and Juanita's testimony are not totally credible.

3. Plaintiff has the residual functional capacity to work without exertional limitations.

4. Plaintiff has the mental capacity to understand, remember, and carry out simple instructions, and to interact appropriately with others in a worklike setting.

5. Plaintiff could be expected to make a vocational adjustment to work that exists in significant numbers in the national economy considering the types of work plaintiff is functionally capable to perform and plaintiff's age, education and work experience.

6. Vocational testimony established that plaintiff could perform the range of unskilled work at all exertional levels.  (AR 26-27.)

### DISCUSSION

### Standard Of Review

Congress has provided limited judicial review of a Commissioner's decision made through an ALJ.  *See* 42 U.S.C. § 405(g).  A court must uphold the Commissioner's decision, made through an ALJ,

1   when the determination is not based on legal error and is supported by substantial evidence. *See Jones*

2   *v. Heckler*, 760 F.2d 993, 995 (9th Cir. 1985); *Sanchez v. Secretary of Health & Human Services*, 812

3   F.2d 509, 510 (9th Cir. 1987) (two consulting physicians found applicant could perform light work

4   contrary to treating physician's findings).[4]   Substantial evidence is "more than a mere scintilla,"

5   *Richardson v. Perales*, 402 U.S. 389, 402, 91 S.Ct. 1420 (1971), but less than a preponderance,

6   *Sorenson v. Weinberger*, 514 F.2d 1112, 1119, n. 10 (9th Cir. 1975). Substantial evidence "means such

7   evidence as a reasonable mind might accept as adequate to support a conclusion." *Richardson*, 402 U.S.

8   at 401, 91 S.Ct. 1420; *Sandgathe*, 108 F.3d at 980.

9        The record as a whole must be considered, weighing both the evidence that supports and detracts

10   from the Commissioner's conclusion. *Sandgathe*, 108 F.3d at 980; *Jones,* 760 F.2d at 995. If there is

11   substantial evidence to support the administrative finding, or if there is conflicting evidence that will

12   support a finding of either disability or nondisability, the finding of the Commissioner is conclusive.

13   *Sprague v. Bowen*, 812 F.2d 1226, 1229-1230 (9th Cir. 1987). If the evidence is susceptible to more than

14   one rational interpretation, the court may not substitute its judgment for that of the Commissioner.

15   *Tackett v. Apfel*, 180 F.3d 1094, 1097 (9th Cir. 1999); *Morgan v. Commissioner*, 169 F.3d 595, 599 (9th

16   Cir. 1999).

17        This Court reviews the ALJ's decision pursuant to 42 U.S.C. § 405(g) to determine whether it

18   is: (1) based on proper legal standards; and (2) supported by substantial evidence in the record as a

19   whole. *Copeland v. Bowen*, 861 F.2d 536, 538 (9th Cir. 1988). Plaintiff bears the burden to prove that

20   she is disabled which requires presentation of "complete and detailed objective medical reports of her

21   condition from licensed medical professionals." *Meanel v. Apfel*, 172 F.3d 1111, 1113 (9th Cir. 1999)

22   (citing 20 C.F.R. §§ 404.1512(a)-(b), 404.1513(d)). "A decision of the ALJ will not be reversed for

23   errors that are harmless." *Burch v. Barnhart*, 400 F.3d 676, 679 (9th Cir. 2005).

24        Here, plaintiff claims disability based on fibromyalgia, pain, depression, morbid obesity and

25   diabetes. As discussed below, this Court finds that the ALJ properly evaluated the evidence and that his

26

27       [4]    "The district court properly affirms the Commissioner's decision denying benefits if it is supported by substantial evidence and based on the application of correct legal standards." *Sandgathe v. Chater*, 108 F.3d 978, 980 (9th

28   Cir. 1997).

1   conclusion that plaintiff is not disabled is based on proper legal standards and substantial evidence.

2   **Evaluation Of Opinions Of Dr. Sidhu And Mr. Uttenreither**

3   Plaintiff argues the ALJ erred in failing to adopt the opinions of Dr. Sidhu and Mr. Uttenreither.

4   The Commissioner responds that the ALJ properly assessed the medical opinions and that substantial

5   evidence supports the ALJ's finding that plaintiff is not disabled.

6   The ALJ thoroughly discussed Dr. Sidhu and Ms. Rowell's essentially check off form and Mr.

7   Uttenreither's comments:

8   Little weight is given to the clinicians' May 2002 assessment showing that the claimant
    could perform a very limited range of sedentary work.  The assessment appears to
9   completed by a nurse practitioner [Ms. Rowell], and though counter-signed by Dr. Sidhu,
    does not rely on his examination findings.  Further, it is inconsistent with the Sequoia
10  treating records which reflect the claimant's chronic complaints, but generally do not
    show findings of musculoskeletal or neurological impairment. The summary assessment
11  is clearly based on the physical therapist's functional testing, without consideration of
    the inconsistencies and possible invalidity of the claimant's efforts (Exhibits 28F; 29F).

12  In evaluating the functional testing which preceded the summary assessment, substantial
13  weight is given to Mr. Uttenreither's August 2003 comments on the testing and the
    significance of claimant's efforts (Exhibit 19E).  Mr. Uttenreither . . . indicated that
14  invalid results could be produced by pain, or fear of pain.  He also stated that the
    claimant's failure to produce any grip strength results on the Rapid Exchange Grip test
15  was aberrant, since the testing device was sensitive to even slight pressure.  Mr.
    Uttenreither noted further discrepancies: the claimant used a cane to walk, which
16  required some grip strength, and she was able to pull a 30 pound sled for 5 feet, which
    also required some grip strength. . . .

17
18  . . . Mr. Uttenreither's carefully worded analysis avoids saying that . . . the claimant gave
    poor effort, but points out the numerous inconsistencies in her efforts, and concludes that
19  only a broad statement that she has sedentary capacity is justifiable.  However, the fact
    that the claimant gave inconsistent or invalid effort during testing supports the finding
20  that no reliable conclusion about her functional capacity can be made, based on that
    testing.  (AR 23-34.)

21  Despite plaintiff's attempts to bolster Dr. Sidhu and Ms. Rowell's May 10, 2002 assessment,

22  there is an absence of evidence that Dr. Sidhu treated plaintiff in a manner to support the wide ranging

23  limitations noted on his and Ms. Rowell's assessment which is contradicted by Dr. Young.  Dr. Young's

24  January 29, 2001 examination revealed neither swelling nor tenderness to plaintiff's wrists, no swelling

25  of metacarpophalangeal, PIP or DIP hand joints, full hand joint range of motion, no hip pain with range

26  of motion, neither swelling nor tenderness to plaintiff's knees, and plaintiff's normal gait.  (AR 294.)

27  Dr. Young noted that plaintiff "did not produce maximal effort with this exam." (AR 294.) Dr. Young

28  concluded: "The patient is felt to have morbid obesity but we are unable to appreciate any

1  musculoskeletal deformities of significance." (AR 294.) Reports of consultative physicians, like Dr.

2  Young, "may serve as substantial evidence." *Andrews v. Shalala*, 53 F.3d 1035, 1041 (9th Cir. 1995).

3      The ALJ was entitled to reject Dr. Sidhu and Ms. Rowell's assessment in it is "brief and

4  conclusory in form with little in the way of clinical findings to support its conclusion." *Magallanes v.*

5  *Bowen*, 881 F.2d 747, 751 (9th Cir. 1989). Moreover, Dr. Sidhu and Ms. Rowell's check off report with

6  brief comments is not entitled to deference. *Crane v. Shalala*, 76 F.3d 251, 253 (9th Cir. 1996); *Murray*

7  *v. Heckler*, 722 F.2d 499, 501 (9th Cir. 1983) (expressing preference for individualized medical opinions

8  over check off forms). Moreover, plaintiff provides neither legal authority nor factual support to criticize

9  the ALJ's assessment of Mr. Uttenreither's comments, which the ALJ cogently addressed.

10                      **Evaluation Of Nonexamining Physicians**

11      Plaintiff criticizes the ALJ's evaluations of Drs. Wallace, Wong, Murillo and Ginsberg who

12  limited plaintiff to light residual functional capacity. The Commissioner responds that "since substantial

13  medical evidence established that plaintiff did not have any physical impairment, much less one that

14  limited her to light work, these nonexamining doctors' opinions had no probative value."

15      The ALJ downgraded the nonexamining physicians' assessments:

16      In evaluating the medical evidence about the claimant's physical impairments, the
        Administrative Law Judge accords substantial weight to the treating evidence from Dr.
17      Watrous, which through May 2001 showed that the claimant had only mild tenderness
        at fibromyalgia trigger points. . . .
18
        Substantial weight is also given to the orthopedic consultative examinations in 1999 and
19      2001, which showed that the claimant had no appreciable tender points, and had a full
        range of movement in her neck, back, and the joints of her extremities. These
20      examinations also demonstrated that there was substantial and inconsistent results from
        testing the claimant's handgrip strength, and that her grip was stronger in 2001 [than] it
21      was in 1999 (Exhibits 6F; 17F). Little weight is given to the opinions of the state agency
        analyst and reviewing medical consultant that the claimant was limited to light exertion,
22      since the treating records show that she had only mild tender points, and the consultative
        examinations showed that she had no musculoskeletal limitations (Exhibit 20F). (AR
23      23.)

24      "[T]he ALJ is responsible for determining credibility, resolving conflicts in the medical

25  testimony, and for resolving ambiguities." *Reddick v. Charter*, 157 F.3d 715, 722 (9th Cir. 1998). If

26  there is more than one rational interpretation of the evidence, the ALJ's conclusion must be upheld.

27  *Richardson*, 402 U.S. at 399, 91 S.Ct. At 1426; *Allen v. Sec. of Health and Human Servs.*, 726 F.2d

28  1470, 1473 (9th Cir. 1984). Opinions of an nonexamining medical advisor may serve as substantial

1   evidence when they are supported by other evidence in the record and are consistent with it. *Morgan*

2   *v. Commissioner of Social Security Admin.*, 169 F.3d 595, 600 (9th Cir. 1999).  "The opinion of a

3   nonexamining physician cannot by itself constitute substantial evidence that justifies the rejection of the

4   opinion of either an examining physician *or* a treating physician." *Lester v. Chater*, 81 F.3d 821, 831

5   (9th Cir. 1995) (italics in original).

6        Plaintiff points to no errors in the ALJ's interpretation of the medical evidence to warrant

7   rejection of the ALJ's conclusions.  The ALJ sufficiently noted that the assessments of the nonexamining

8   physicians were unsupported and inconsistent with evidence deserving more weight.  In light of the

9   evidence, the ALJ accorded proper weight to the assessments of the nonexamining physicians.

10                                  **Credibility Evaluation**

11        Plaintiff criticizes the ALJ's evaluation of plaintiff's pain complaints and credibility.  The

12   Commissioner responds that the ALJ "provided the requisite findings assessing the credibility of

13   plaintiff's self-serving and unsupported subjective complaints."

14        "Credibility determinations are the province of the ALJ." *Fair v. Bowen*, 885 F.2d 597, 604 (9th

15   Cir. 1989); *Russell v. Bowen*, 856 F.2d 81, 83 (9th Cir. 1988).  "An ALJ cannot be required to believe

16   every allegation of disabling pain." *Fair*, 885 F.2d at 603. An ALJ "may disregard unsupported, self-

17   serving statements." *Flaten v. Secretary of Health & Human Services*, 44 F.3d 1453, 1464 (9th Cir.

18   1995).  "If the ALJ finds that the claimant's testimony as to the severity of her pain and impairments is

19   unreliable, the ALJ must make a credibility determination with findings sufficiently specific to permit

20   the court to conclude that the ALJ did not arbitrarily discredit claimant's testimony." *Thomas v.*

21   *Barnhart*, 278 F.3d 947, 958 (9th Cir. 2002).  If an ALJ's credibility finding is supported by substantial

22   evidence in the record, a reviewing court may not engage in second-guessing. *Thomas*, 278 F.3d at 959.

23        In *Light v. Social Sec. Admin.*, 119 F.3d 789, 792 (9th Cir. 1997), the Ninth Circuit commented:

24        In weighing a claimant's credibility, the ALJ may consider his reputation for truthfulness,
         inconsistencies either in his testimony or between his testimony and his conduct, his daily
25        activities, his work record, and testimony from physicians and third parties concerning
         the nature, severity, and effect of the symptoms of which he complains. *Smolen*, 80 F.3d
26        at 1284; *Moncada v. Chater*, 60 F.3d 521, 524 (9th Cir. 1995) (quoting *Orteza v. Shalala*,
         50 F.3d 748, 749-50 (9th Cir. 1995)); 20 C.F.R. § 404.1529(c).  An ALJ's finding that a
27        claimant generally lacked credibility is permissible basis to reject excess pain testimony.

28

                                          22

*See also* S.S.R. 96-7p.[5]

An ALJ may consider the following factors to determine the credibility of a claimant's allegations of disabling pain:

1.   The nature, location, onset, duration, frequency, radiation, and intensity of any pain;

2.   Precipitating and aggravating factors (e.g., movement, activity, environmental conditions);

3.   Type, dosage, effectiveness, and adverse side-effects of any pain medication;

4.   Treatment, other than medication, for relief of pain;

5.   Functional restrictions;

6.   Claimant's daily activities;

7.   Unexplained, or inadequately explained, failure to seek treatment or to follow up a prescribed course of treatment; and

8.   Ordinary techniques to test a claimant's credibility.

*Bunnell v. Sullivan*, 947 F.2d 341, 346 (9th Cir. 1991); *see* 20 C.F.R. §§ 404.1529, 416.929.

After summarizing the medical evidence and testimony and considering plaintiff's subjective complaints, the ALJ explained his rationale to question plaintiff:

> Weighing all the factors, the Administrative Law Judge finds that the claimant's impairments are not as limiting as alleged. The claimant has testified to severe foot pain which is not documented in the recent treating records: these show that the claimant's feet are carefully inspected because of her diabetic condition, and are in good shape. Although the claimant had a left hand tremor at the functional evaluation, the recent treating records show that she does not have neurological deficits; none were apparent at the orthopedic or psychiatric consultative examinations. The treating record consistently documents the claimant's pain complaints, as well as recent liberal prescription of narcotic and anti-inflammatory medications. However, the Sequoia records do not show examination findings about the claimant's tender or trigger points, or specific limitations of range of movement or mobility, which would support the claimant's allegations. The treating records show that the claimant was able to go [to] the fair in October 2002, five months after the functional evaluation showed her unable to walk more that 25-30 feet (Exhibit 30F, p. 7).

---

[5]   Social Security Ruling 96-7p sets out factors to assess a claimant's credibility: (1) claimant's daily activities; (2) location, duration, frequency, and intensity of the claimant's pain or other symptoms; (3) factors that precipitate and aggravate the symptoms; (4) type, dosage, effectiveness, and side effects of any medication the claimant takes or has taken to alleviate pain or other symptoms; (5) treatment, other than medication, the claimant receives or has received for relief of pain or other symptoms; (6) measures other than treatment the individual uses or has used to relieve pain or other symptoms (e.g., lying flat on his or her back, standing 15 to 20 minutes every hour, or sleeping on a board); and (7) any other factors concerning the individual's functional limitations and restrictions due to pain or other symptoms.

1
2
3
4
5
6
7
8

The claimant's credibility is lessened by her invalid efforts at the May 2002 functional evaluation, which suggests an attempt to create the appearance of severe physical impairment. Although the claimant denied the ability to calculate change during the psychiatric evaluations, the Administrative Law Judge notes that the claimant worked selling produce at a family-operated stand, and finds it unlikely that she would not be able to calculate change (Exhibits 5F; 16F). Further, in July 2000 the claimant applied for benefits for herself and her son; the interviewer observed the claimant appeared to have no apparent physical or mental limitations, and had no trouble understanding the process of application (Exhibit 6E). These observations lessen the credibility of a written report from the claimant's daughter showing that the claimant had substantial physical limitations, as well some mental limitations from pain medications (Exhibit 6E). The testimony of family members, which shows that the claimant has substantial restrictions, is not credible because it is contradicted by the impartial observations of the interviewer and by the consultative orthopedic and psychiatric examiners. (AR 25.)

9
10
11
12
13
14
15
16
17
18

The ALJ properly focused on the substantial medical evidence of normal function and the lack of underlying conditions to support plaintiff's extreme allegations. The record reveals numerous inconsistencies and other challenges to plaintiff's credibility. Despite reporting benefits of exercise and recommendations to exercise, the record lacks notations of plaintiff's exercise efforts. (AR 171, 182, 202.) Dr. Watrous, a treating physician, refused to place plaintiff on disability or to excuse her from employment training. (AR 255.) Dr. Watrous ceased treating plaintiff. (AR 257, 499.)[6] Plaintiff noted a treating physician told her "there is nothing more he could do for her and told her to find a different Dr." (AR 159.) Plaintiff further noted that a second doctor stopped treating her and did not make a referral for her. (AR 159.) Such comments reflect physician doubts as to the severity of plaintiff's claims.

19
20
21
22
23
24
25
26

Plaintiff informed Dr. Barnett of her employment working at a vegetable stand for eight or nine years to contradict plaintiff's claims of inability to make change. (AR 289.) Dr. Barnett found plaintiff lacks "symptoms that would interfere with a normal work day or work week." (AR 207.) Dr. Barnett concluded: "She would be able to work an eight-hour day, attend work regularly and perform work duties consistently without special or additional supervision." (AR 291.) Dr. Young's examinations revealed "no objective findings of her muscular skeletal system," no "musculoskeletal deformities of significance" and absence of maximal effort. (AR 211, 294.) Even giving plaintiff the benefit of doubt, Mr. Uttenreither noted plaintiff's invalid effort and inconsistencies among her test results and abilities

27
28

[6] This Court is unpersuaded by plaintiff's comments regarding Dr. Watrous' termination of plaintiff's treatment and finds the termination infers, at a minimum, doubts as to the severity of her claims.

1  to grip a cane and grasp sled handles and pull a 30-pound sled.  (AR 481, 482.)  Plaintiff's claim that

2  medication relieves pain and causes no side effects contradicts her allegations.  (AR 118.)  Despite

3  claiming inability to drive, plaintiff noted she drove her son to school and her daughters to the store and

4  doctors.  (AR 528.)  Out of apparent desperation, plaintiff seemingly exaggerates that she needs to drink

5  small quantities from small styrofoam cups and to place her mattress on the floor without notations to

6  such effect in the medical record.  (AR 549, 551.)

7      In passing, plaintiff claims the ALJ failed to address medication side effects.  The Commissioner

8  correctly notes the invalidity of plaintiff's claim of disabling side effects of medications in the absence

9  of probative medical evidence to establish such side effects and plaintiff's functional limitations from

10  medications.  Moreover, the record notes plaintiff's treating physicians closely monitored and adjusted

11  plaintiff's medications.  (AR 176, 179, 182, 183, 198, 199, 202, 203, 255, 260.)

12      Plaintiff further questions the ALJ's rejection of the claims of plaintiff's daughters regarding

13  plaintiff's pain.  "If the ALJ wishes to discount the testimony of the lay witness, he must give reasons

14  that are germane to each witness."  *Dodrill v. Shalala*, 12 F.3d 915, 919 (9th Cir. 1993.)  The ALJ

15  properly rejected the claims of plaintiffs' daughters because they are "contradicted by the impartial

16  observations of the interviewer and by the consultative orthopedic and psychiatric examiners."  (AR 25.)

17   Moreover, Ms. Harlien's comments that plaintiff go days without sleep are contradicted by plaintiff's

18  testimony that she lies down two or three times a day and sleeps and sister Juanita's testimony that at

19  times plaintiff is unable to get up.  (AR 147, 525, 534.)  Despite absence of documentation in the

20  medical record, Juanita testified plaintiff's legs give out to cause her to fall.  (AR 533.)  In apparent

21  exaggeration unsupported by the medical evidence, Juanita claimed plaintiff could not hold babies for

22  fear of dropping them and gets burned from dropping utensils or spilling cooking oil.  (AR 554, 557.)

23                              **Evaluation Of Vocational Expert Testimony**

24      Plaintiff argues the ALJ failed to adopt vocational expert Mr. Dashalet's testimony most likely

25  matching the evidence.  The Commissioner counters that although Mr. Dashalet testified plaintiff would

26  be disabled if as limited as she claimed, substantial evidence established that she was not so limited.

27      An ALJ may properly "limit a hypothetical to those impairments that are supported by substantial

28  evidence in the record."  *Osenbrock v. Apfel*, 240 F.3d 1157, 1165 (9th Cir. 2001).  "An ALJ is free to

                                        25

1    accept or reject restrictions in a hypothetical question that are not supported by substantial evidence."

2    *Osenbrock*, 240 F.3d at 1165; *see Magallanes*, 881 F.2d at 756-757.  The parameters of an ALJ's

3    hypotheticals need not "include any alleged impairments that the ALJ has rejected as untrue."  *Long v.*

4    *Chater*, 108 F.3d 185, 188 (8th Cir. 1997).  An ALJ is not bound to accept restrictions in a hypothetical

5    question of claimant's counsel.  *Martinez v. Heckler*, 807 F.2d 771, 773 (9th Cir. 1986).

6        Plaintiff points to no error in the ALJ's rejection of the foundation of the hypotheticals posed to

7    Mr. Dashalet.  Substantial evidence, including Mr. Dashalet's response to the second hypothetical,

8    supports that plaintiff can perform simple, unskilled work at all exertional levels.  The hypotheticals

9    relied upon by plaintiff include impairments unsupported by substantial evidence in the record. The ALJ

10   properly exercised his discretion to reject unsupported restrictions.

11                              **CONCLUSION AND ORDER**

12       For the reasons discussed above, this Court finds no error in the ALJ's analysis and that the ALJ

13   properly concluded plaintiff is not disabled.  This Court further finds the ALJ's decision is supported

14   by substantial evidence in the record as a whole and based on proper legal standards.  Accordingly, this

15   Court DENIES plaintiff's request to reverse the Commissioner's decision to deny plaintiff SSI, or

16   alternatively, to remand for further proceedings.  This Court DIRECTS the Court's clerk to enter

17   judgment in favor of defendant Jo Anne B. Barnhart, Commissioner of Social Security, and against

18   plaintiff Liliana Magdaleno and to close this action.

19       IT IS SO ORDERED.

20   **Dated:    May 12, 2005**              _____/s/ Lawrence J. O'Neill_____
21   66h44d                                  UNITED STATES MAGISTRATE JUDGE

22

23

24

25

26

27

28